IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| LAWRENCE BYBEE,<br><br>          Plaintiff,<br><br>vs.<br><br>BANK OF AMERICA, N.A.;<br>RUSHMORE LOAN MANAGEMENT<br>SERVICES, LLC; STATEBRIDGE<br>COMPANY, LLC,<br><br>          Defendants. | CV 14–64–H–CCL<br><br><br>OPINION &<br>ORDER |

Before the Court are Defendants' Motions for Summary Judgment. The motions came on for hearing on June 23, 2017. Plaintiff Lawrence Bybee ("Bybee") was represented by Brian Miller. Defendant Bank of America, N.A. ("BANA") was represented by Mark D. Etchart. Defendants Rushmore Loan Management Services, LLC ("Rushmore") and Statebridge Company, LLC ("Statebridge") were represented by Erika R. Peterman. Having received the parties' arguments and evidence and having reviewed the briefs and all the record, the Court is prepared to decide the motions.

Bybee's Fourth Amended Complaint (ECF No. 57 "FAC") in this case alleges that BANA was negligent in its processing of his loan modification and short sale applications and that BANA violated the Montana Consumer Protection Act ("MCPA") by its allegedly unfair or deceptive conduct in handling his short sale applications and foreclosure activities. Bybee alleges that Rushmore violated the MCPA by denying his loan modification application, attempting to foreclose on his home, and sending its agents to trespass upon his property. Bybee alleges that Statebridge violated the Fair Debt Collection Practices Act, 15 U.S.C. 1692, sending him a letter when he was represented by counsel and by sending him a loan statement in October 2015 showing a balance due. Bybee alleges that Statebridge's agents entered his property to inspect it without his consent, thereby trespassing.

BACKGROUND

In March 2007, Plaintiff Lawrence Bybee obtained a $157,528.00 loan from Taylor, Bean, and Whitaker Mortgage Corp. ("TBW") in connection with his

purchase of a residence in Shepherd, Montana.  Bybee signed a promissory note,

which provided a fixed interest rate of 6.375%, a thirty year term, and monthly

principal and interest payment of $982.77.  Bybee also executed a deed of trust as

security for the note.  The loan was insured by the Federal Housing Administration

("FHA") and was therefore subject to the guidelines in Mortgage Letters issued by

the Department of Housing and Urban Development ("HUD").  Bybee made

payments on the loan for approximately 18 months, until October 2008.  Bybee

tried to get a loan modification from TBW, and in fact thought at one point that he

had a loan modification worked out, but it was never finalized.  Bybee's wife

testified that when she sent TBW three monthly payments in three checks (for

March, April, and May of 2009), as she had been instructed to do per the work out,

TBW returned the checks with a letter stating that the loan modification had failed

for their failure to pay a $100.00 fee, and the loan was now in foreclosure.  (ECF

No. 117-4, Dep. T. Bybee, 64:1-65:5.)  On June 12, 2009, TBW recorded notice of

foreclosure sale, stating that Bybee was delinquent on payments beginning

October 1, 2008, in the amount of $11,381.67.  (ECF No. 108-5.)  The sale date

listed on the notice of trustee's sale was October 20, 2009.

However, in August of 2009, TBW was shut down by the federal government and prohibited from servicing mortgages. Ultimately, TBW declared bankruptcy and ceased doing business. The Government National Mortgage Association ("GNMA") purchased the loan. (ECF No. 9-2, ¶ 13.)

In September, 2009, Bank of America, N.A. ("BANA") became the new servicer of Bybee's loan. On the day that BANA received the Bybee loan, it was 11 months delinquent and already in default. (ECF No. 120-6, Dep. J. Chatman, 102:23-25.). Bybee attempted to make only one monthly payment to BANA. A September 2009 payment in the amount of $1,275.00 was rejected by BANA because the payment was insufficient to correct the default. (ECF No. 120-6, Dep. J. Chatman, 109:14-110:8.)

BANA sent letters to borrowers letting them know what documents to send for loan modification or loss mitigation options. (ECF No. 120-6, Dep. J. Chatman, 103:1-11.) In October 2009, Bybee then told BANA that he wanted a loan modification; he claimed that he already was supposed to have a loan

modification with TBW, but he did not send BANA any copies of TBW

modification documents (ECF No. 120-2, Dep. L.Bybee, 2-9.)  At that point, his

loan was twelve months delinquent.  In December, 2009, Bank of America

informed Bybee that it would not attempt to undo any mistake made by TBW, but

that it would consider him for a loan modification.  (ECF No. 9-2, ¶ 15.)  Bybee

began the process of submitting documents to BANA in support of a loan

modification application, but by February 2010, Bybee still had not submitted all

the necessary documentation, such as his pay stub, bank statements, utility bill,

and income tax return or W-2.  (ECF No. 120-6, Dep. Chatman, 47:1-10.)  As late

as May and June 2010, Bybee was still submitting financial documents to BANA

to support the loan modification application.  (ECF No. 109-15, Dep. T.Bybee,

73:24-74:3.)  Bybee turned over all communications with BANA to his wife,

Theresa Bybee, on May 25, 2010, when he faxed BANA a document granting his

wife his power of attorney.  (ECF No. 120-2, Dep. L.Bybee, 12:10; ECF No. 109-

15, Dep. T.Bybee, 74:18-76:10.)

     In its review of Bybee's file, BANA first considered the Bybee loan for the

Making Home Affordable Program, but it did not qualify because it was an FHA-insured loan. In January 2010, BANA reviewed the Bybee loan for a brand new program, the Home Affordable Mortgage Program ("HAMP") loan modification, but found that Bybee's loan was disqualified because, first, it was more than 12 months delinquent, and, second, because the loan did qualify for the standard FHA non-HAMP loan modification. (Bybee's loan was not co-insured, which would have disqualified his loan for a non-HAMP modification. (ECF No. 127-9, ML 19944-42.))

On July 15, 2010, BANA offered Bybee an FHA non-HAMP loan modification. By this time, Bybee was earning $49,000 per year, which was approximately $10,000 more than he had earned when he first obtained his loan from TBW in 2007. The terms of the FHA non-HAMP loan modification were to raise his payment by $14.00 per month, reduce the interest rate from 6.375% to 5.0%, lengthen the loan term by three years, and capitalize $26,694.32 arrearages (all of the unpaid interest, taxes, insurance). Bybee rejected this offer because he did not want to capitalize $17,885.77 in interest, believing that particular item was

not his "fault." (However, HUD Mortgagee Letter 2000-05 provides that a principal, interest, or taxes/insurance arrearages may be capitalized to the mortgage balance for purposes of the loan modification. (ECF No. 108-10.)) Bybee having rejected BANA's proposed loan modification, on August 3, 2010, BANA rejected Bybee's loan modification application for Bybee's failure to sign and return the loan modification agreement. (ECF No. 108-17.)

Before rejecting the loan modification offered by BANA in July 2010, however, Bybee had already moved his family out of the home in June 2010 and even removed the kitchen appliances to their new rental house. (ECF No. 120-3, Dep. T.Bybee, 103:6-8.) In packing up to move, Bybee's wife threw away all of their correspondence to and from TBW (ECF No. 120-3, Dep. T.Bybee, 60:1-6), meaning that the evidence Bybees could give regarding TBW's communications with them would be inadmissible hearsay. In August, 2010, Bybee listed the property for sale for $189,900.00, but at the same time Bybee's wife began exploring the possibility of a short sale, by which BANA could accept a third-party's offer to purchase the home for a sum less than the balance due (and then be

reimbursed for the difference between the sale price and the loan from the government).

On September 27, 2010, BANA recorded a notice of trustee's sale, its first such notice, that had been signed on September 22, 2010, with a sale date of February 7, 2011. (ECF No. 108-18.) The sale was canceled on February 2, 2011, by recorded notice. (ECF No. 108-19.)

On September 23, 2010, Homestead Properties, Inc. ("Homestead"), entered into an agreement with Bybee to purchase the home for $138,018.00. Homestead was experienced in purchasing properties through short sales, and the owner of Homestead, Linda Schicktanz, advised Bybee on how to obtain BANA's approval for a short sale. (ECF No. 109-14, Dep. L. Bybee, 188:22-25.) Schicktanz submitted her offer to BANA on September 23, 2010. (ECF No. 120-3, Dep. T.Bybee, 150:9-14.) In fact, the Bybees gave Schicktanz a power of attorney so she could communicate directly with BANA regarding a short sale and so that neither Mr. nor Mrs. Bybee would have to talk to BANA about the proposed short sale. (ECF No. 109-15, Dep. T.Bybee, 138:20-140:19.)

BANA was willing to consider a short sale.  Pursuant to HUD requirements, BANA ordered an appraisal of the property, and the November 1, 2010, appraisal concluded that the fair market value of the home in "as is" condition was $162,000.00.  (ECF No. 108-22 at 4.)  The appraisal noted certain deficiencies on the property, such as a water cistern needing replacement, minor repairs needed in the bathroom and kitchen, and a foundation wall requiring inspection due to bowing and cracks (with "costs to cure less than $5,500").  (ECF No. 108-22 at 5.) (However, the water cistern problem turned out merely to be a broken pump that was replaced subsequently by Bybee for less than $2,500.  (ECF No. 127-6, Dep. T.Bybee, 136:23-137:13.))

Following HUD short-sale regulations, BANA issued an Approval to Participate ("ATP") letter on November 15, 2010 (ECF No. 23), which meant that Bybee had four months from that date to submit a qualifying short-sale offer that met HUD guidelines.  At least initially, the short sale offer had to be at least 88% of fair market value; Homestead's offer of $138,118.00 did not meet that basic requirement.  HUD guidelines provide that during the four-month short-sale time

period, an acceptable offer had to be 88% of FMV ($142,560.00) during the first month, 86% of FMV during the second month ($139,320), and 84% of FMV during the third and fourth months ($136,080). (Mortgage Letter 2008-43, ECF No. 108-20.) However, at Bybee and Homestead's request, a second appraisal was substituted for the first appraisal, so during the third and fourth months, the acceptable offer had to be 84% of $172,000.00, or $149,520.00. Instead, Homestead's second bid was for $114,200, on January 23, 2011.

After the appraisal came in low at $162,000 and Homestead's offer was clearly inadequate, Schicktanz requested over the phone that a second appraisal be obtained because the property required numerous repairs which she and the Bybees thought were unaccounted for in the appraisal. (ECF No. 109-13, Dep. Schicktanz, 197:7-14.) Homestead's position was that the $162,000 appraisal value too high. (ECF No. 109-13, Dep. Schicktanz, 188:6-19; ECF No. 109-15, Dep. T. Bybee, 174:25-175:2; ECF No. 109-4, Expert Report Steve Zech, ¶ 20.) Therefore, at Homestead and Bybee's request, BANA ordered that a second appraisal be conducted. In addition, Homestead dropped its offer to purchase the

property to $114,200.00.  (ECF No. 127-4, Dep. Schicktanz, 185:5-13.)  On

January 23, 2011, Schicktanz signed the "Real Estate Purchase and Sale

Agreement" that listed the total purchase price as $114,200.00, and Bybee signed

the same agreement on January 24, 2011.  In this Purchase and Sale agreement,

Schicktanz agreed to accept the property in "as is/where is" condition, and the sale

was made "contingent upon the seller obtaining prior written approval of Bank of

America."  (ECF No. 108-25 at 2.)

On February 11, 2011, the second appraisal was published, and it concluded

that the "as is" fair market value of the property was now higher, at $178,000.00.

By this point in time, the offer had to be 84% of fair market value, and Homestead

Inc.'s $114,200 offer was well below that threshold and therefore unacceptable

under HUD guidelines.  Schicktanz acknowledges that she never submitted an

offer that met HUD's minimum net proceeds requirement.  (ECF No. 109-13, Dep.

Schicktanz, 256:2-8.)  Finally, on May 21, 2011, BANA terminated the ATP and

informed Bybee that a foreclosure sale would be scheduled.  (ECF No. 108-26.)

In August of 2011, Schicktanz began to inquire with BANA about making a

second application for a short sale.  (ECF No. 108-27.)  Schicktanz resubmitted to

BANA Homestead's $114,200 offer to purchase the property.  (ECF No. 127-4,

Dep. Schicktanz, 209:2-10.)  BANA never issued a new Approval to Participate

(ATP) necessary for a short sale.  Schicktanz wanted BANA to obtain a variance

from HUD to the net sale proceeds requirement based on what they considered to

be significant repairs needed to make the property habitable.  Fred Benton, a

BANA loss mitigator, told them that they had to document the repairs needed.

(ECF No. 108-27.)

However, this second attempt to begin the short sale process was denied by

BANA on September 20, 2011, for the reason that the first six-month ATP had

expired.  (ECF No. 108-28.)  In other words, under HUD regulations, BANA was

not obligated to give Bybee repeated opportunities (lasting 120 days each) to

attempt to obtain an adequate short sale offer.  Mortgagee Letter 2000-05 states

that the lender should consider all loss mitigation options, but it does not state that

all options must be considered as many times as requested or otherwise

repetitiously.  (ECF No. 108-10.)  In addition, Mortgagee Letter 200-05(J) states

that any abandonment of the property permits a lender to immediately proceed to foreclosure, and the Bybees were not residing on the property in 2011. (ECF No. 108-10.)

On December 3, 2011, BANA noted that the second request short sale application was declined and that a deed-in-lieu of foreclosure would be attempted. (ECF No. 108-31.) On December 12, 2011, BANA sent Bybee a letter offering a deed-in-lieu of foreclosure and itemizing the documents that Bybee should submit in order to take advantage of this loss mitigation effort. (ECF No. 108-32.) Basically, the deed-in-lieu of foreclosure option permits the borrower to convey the property to the FHA and to be relieved of the borrower's mortgage obligation. Eight days later, on December 20, 2011, BANA notes that it is

> "Canceling File - No Water in the home cistern broke-many other major issues with home per h/o [home owner] and attny [attorney]. The homeowners will not return the DIL [deed-in-lieu] docs because they want to go back to SS [short sale]. Have explained several times the process. Canceling file due to no docs returned."

(ECF No. 108-33.) Bybee was not interested in a deed-in-lieu of foreclosure because he believed that it would be more damaging to his credit than a short sale.

(ECF No. 120-2, Dep. L. Bybee, 171:14-172:2.)  Bybee rejected BANA's offer of

a deed-in-lieu of foreclosure.

As a consequence of having worked through all the loss mitigation options

without success, beginning in early 2012, BANA began issuing Notices of

Trustee's Sales.  On January 13, 2012, BANA recorded a Notice of Trustee's Sale

to be held on May 29, 2012.  (ECF No. 108-35 at 1.)  On April 4, 2012, BANA

recorded a cancellation of that trustee's sale.  (ECF No. 108-36.)  Another Notice

of Trustee's Sale to be held on August 15, 2012, was recorded on April 10, 2012.

(ECF No. 108-35 at 4.)  That sale was canceled on August 7, 2012.  (ECF No.

108-36 at 2.)

On August 6, 2012, BANA notes that "Borrower not eligible for retention

because. . . Property is non-owner occupied (or vacant)."  (ECF No. 108-37.)

In summary, by the end of 2011, BANA had spent approximately 27 months

trying to assist Bybee in avoiding foreclosure.  Bybee paid no principal, interest,

taxes, or insurance on the property for those 27 months or for the preceding 11

months when TBW was servicing the loan, for a total of 38 months delinquent.

BANA had offered Bybee three loss mitigation measures:  a loan modification that was rejected, a short sale option that was unfulfilled, and a deed-in-lieu of foreclosure that was rejected.  It is true that Bybee attempted to offer payments on a couple of occasions (three monthly payments offered to TBW and one monthly payment offered to BANA), but Bybee offered these partial payments too late, after the loan was in default and after both servicers were authorized (by the Note, the Deed of Trust, and HUD requirements) to reject any payment but payment in full.

At some point after December 2011, Bybee consulted an attorney and was told that he might just as well move his family back onto the property, so he did move back onto the property, without notifying BANA.  (ECF No. 109-14, 233:24-234:10.)  He returned his family to the property in about July or September 2012.  (ECF No. 127-5, Dep. L. Bybee, 10:13-25; ECF No. 109-15, Dep. T. Bybee, 8:22-23.)

BANA transferred the right to service Bybee's loan to Rushmore on August 1, 2013.  (ECF No. 63, ¶1.)  By June 2014, the arrearages on Bybee's loan

were $88,226.24.  (ECF No. 57, FAC ¶34.)  Rushmore had the property inspected on a monthly basis pursuant to the Deed of Trust provision allowing for inspections of the property if the borrower is in default on the loan.  Rushmore initiated foreclosure proceedings in June 2014, notifying Bybee of the prospective sale date of October 17, 2014.  (ECF No. 57, FAC ¶35.)  This prompted Bybee to file for an injunction in state court.  After Rushmore transferred the right to service Bybee's loan to Statebridge in July 2015, the arrearages on Bybee's loan were $119,349.02.  (ECF No. 99-2.)  Statebridge sent Bybee a letter explaining that it was the new servicer (as required by 12 U.S.C. § 2605(c)(1)).  (ECF No. 99-1.) Statebridge sent Bybee a mortgage statement.  (ECF No. 99-2.)  Statebridge also inspected the property on a monthly basis.

Bybee was never present during monthly inspections because they all took place when he was at work.  (ECF No. 102-4, Dep. L.Bybee, 298:9-18.)  The inspectors would drive onto the driveway and take a photograph of the residence, but they did not enter the residence.  (ECF No. 102-5, 272:23-25.) Monthly inspections continue today.

PROCEDURAL BACKGROUND

On June 28, 2013, Bybee filed suited against BANA in the Montana First

Judicial District Court, Lewis and Clark County, on June 28, 2013.  On August 1,

2013, BANA stopped servicing Bybee's loan, and Rushmore Loan Management

Services, LLC ("Rushmore"), began servicing Bybee's loan.  Rushmore scheduled

a foreclosure sale date of October 17, 2014, but the sale was restrained by a

temporary injunction issued by the state district court on October 15, 2014.  (ECF

No. 2-1.)  By this time, Bybee was approximately $88,226.24 in arrears on his

loan, and the state court required Bybee to begin making monthly loan payments

($1,000.00) into his counsel's trust account.  BANA then removed the state court

case against BANA and Rushmore to this federal court in 2014, and this court also

enjoined any sale of the property.  Subsequently, this Court ordered Bybee to

make his monthly loan payments into counsel for Rushmore's trust account.[1]

---

[1]    On October 31, 2014, the parties stipulated that Rushmore would not
seek foreclosure during the pendency of this suit, and Bybee would make a

In July 2015, Rushmore stopped servicing Bybee's loan, and Statebridge Company, LLC ("Statebridge"), started servicing Bybee's loan.  Bybee then amended his complaint to add Statebridge as a Defendant.  Bybee continues to live on the property and pays $1,000.00 per month into Rushmore's counsel's trust account.

LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "A party asserting that a fact cannot be or is

---

$1,000.00 payment to Rushmore each month.  (ECF No. 15.)  On November 3, 2014, this Court granted Bybee's request for a preliminary injunction against any foreclosure sale and ordered Bybee to deposit $1,000.00 per month with Rushmore.  (ECF No. 16.)  On June 12, 2015, Rushmore notified the Court that a problem with its internal controls had resulted in return of Bybee's monthly payments to him.  (ECF No. 32.)  Without opposition from Bybee, Rushmore sought a modification of the preliminary injunction order to direct Bybee to make his monthly payments to counsel's trust account instead of to Rushmore directly.  (ECF No. 32.) The Court granted that request by order dated July 17, 2015.  (ECF No. 33.)

genuinely disputed must support that assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A), (B).

The summary judgment movant bears the initial burden as to the elements of the causes of action about which there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to establish the existence of a material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e) (1963) (amended 2010)). A disputed fact raises a *genuine* issue for trial if it would permit a reasonable jury to

return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must construe

disputed facts in the light most favorable to the non-moving party. *Ellison v.

Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). However, bare assertions

standing alone are insufficient to create material facts. *Liberty Lobby*, 477 U.S. at

247-48. If the burden shifts, the non-moving party must produce "significant

probative evidence," and "may not rely merely on the unsupported or conclusory

allegations of [his] pleadings." *Coverdell v. Dep't of Soc. & Health Servs.*, 834

F.2d 758, 769 (9th Cir. 1987).


DISCUSSION

BANA did not owe a fiduciary duty to Bybee. BANA did not advise Bybee

in any respect except only to perform the ordinary communications between a loan

servicer and a mortgagor by responding to Bybee's inquiries and telling him, his

wife, or his agent Linda Schicktanz, what documentation he should submit to

apply for a loan modification, short sale, or deed-in-lieu of foreclosure. BANA

did not tell Bybee to miss a payment, to make a reduced payment, to ignore a

notice of default, or to avoid curing default (ECF No. 109-14, Dep. L. Bybee,

190:7-22), and, in fact, Bybee actually did enter into a fiduciary relationship with

Homestead, Inc., to have that entity guide him through the short sale process (ECF

No. 109-14, Dep. L. Bybee, 188:22-25). *See Morrow v. Bank of America, NA*, 324

P.3d 1167, 1177-78 (Mont. 2014).

A negligence claim requires that Bybee show (a) BANA owed him a duty;

(b) there was a breach of that duty; (c) the breach proximately caused Bybee's

injury; and (d) actual loss or damage resulted. BANA has demonstrated that it

owed Bybee no duty, and Bybee has failed to show any actual loss or damage

resulting from BANA's actions (*see* ECF No. 109-14, Dep. L. Bybee, 234:15-

236:25), but out of an abundance of caution, the Court has examined BANA's

conduct in detail to determine whether there is evidence of breach of a duty or

damages and also whether there is evidence of unfair or deceptive conduct in

BANA's handling of Bybee's short sale application and foreclosure notifications.

The Court finds that most of Bybee's Fourth Amended Complaint is

actually founded upon his allegations against TBW, his original loan servicer.

Bybee alleges that it is TBW's fault that he first missed a mortgage payment.

(ECF No. 57, FAC ¶9.) Bybee alleges that TBW gave him a loan modification–or

at least he thought that TBW gave him a loan modification--but then TBW

withdrew the modification without justification. (ECF No. 57, FAC ¶11.) Bybee

alleges that TBW became non-responsive to his requests for information and

assistance and then, of course, it went out of business altogether. (ECF No. 57,

FAC ¶13.) However, Bybee's wife threw away all their written documentation to

and from TBW (ECF No. 120-3, Dep. T.Bybee, 60:1-6), so Bybee's sole evidence

to support his allegations against TBW comes from the testimony he and his wife

have given in depositions. That is not an insurmountable problem, but, more

importantly, Bybee did not name TBW as a Defendant. Instead, Bybee seeks to

hold his *next* loan servicer, BANA, responsible for TBW's prior alleged misdeeds.

There are at least two problems with this attempt to make BANA liable for TBW:

first, there is no evidence to support a theory of successor liability (which was not

pled) and, second, the statute of limitations has run as to all of TBW's alleged

misconduct.

*Successor Liability*

Asset purchasers are not liable as successor corporations unless: (1) "[t]he purchasing corporation expressly or impliedly agrees to assume the liability; (2) [t]he transaction amounts to a 'de-facto' consolidation or merger; (3) [t]he purchasing corporation is merely a continuation of the selling corporation; or (4) [t]he transaction was fraudulently entered into in order to escape liability." *Atchison, Topeka and Santa Fe Ry. Co.*, 159 F.3d at 361. Defendant BANA is not liable as a successor to TBW because there it did not expressly or impliedly agree to assume the liability, it did not consolidate or merge with TBW, it is not a continuation of the TBW entity, and the transfer or servicing rights was supervised by federal regulators and was not fraudulent. As an assignee of TBW's servicing rights, BANA did not become liable for any wrongs committed by TBW prior to the assignment of rights. There is no evidence that BANA affirmatively assumed the duties, obligations, and consequences of the contract between Bybee and TBW. There is no plausible claim to successor liability on the facts presented in

this record.

*Statute of Limitations*

Indeed, even if there were a plausible claim to successor liability, the statute of limitations would have run on the alleged wrongful acts of TBW, which all occurred prior to August, 2009. The negligence claims and claims of violation of the MCPA carry limitations periods of three and two years, respectively, and Bybee filed his original complaint almost four years later, on June 28, 2013, after all statutes of limitations had run as to all acts of TBW.

This Court has previously held that allegations of wrongful conduct arising prior to June 28, 2010, as to Bybee's negligence claims, are barred by the statute of limitations (Mont. Code Ann. § 27-2-204(1)). (ECF No. 38, Order at 14.) Similarly, allegations of wrongful conduct arising prior to June 28, 2011, as to Bybee's MCPA claims, are likewise barred by a two-year statute of limitations. (ECF No. 38, Order at 17, *citing Osterman v. Sears, Roebuck & Co.*, 2003 MT 327, ¶¶ 20, 24, 318 Mont. 342, 80 P.3d 435 (Mont. 2003).) Thus, not only is TBW's conduct time-barred, but also BANA's conduct prior to offering Bybee a

loan modification in July 2010, is unavailable as a factual support for a negligence claim. BANA's conduct up to and including its decision to deny Bybee's short sale application on May 21, 2011, is also unavailable as a factual support for an MCPA claim. In fact, there appear to be no factual allegations that support Bybee's MCPA claim.

*Loan Modification Application*

The Court has described the facts underlying BANA's offer to Bybee of an FHA non-HAMP loan modification on July 15, 2010. (ECF No. 108-13.) The Court can find no violation of HUD guidelines in the offer. The FHA loan was not eligible for a HAMP modification because it was undeniably more than 12 months delinquent. The date of default was November 1, 2008, because that is thirty days after the first missed monthly payment. *See* C.F.R. § 203.331(b)(2). Bybee's argument that both TBW and BANA should have accepted partial payments, so he was not "really" more than twelve months delinquent ignores the Promissory Note and the Deed of Trust that he signed. Those documents provide

that following default, the lender may reject any but payment in full. (*See* Deed of Trust, ECF No. 108-2, ¶¶9-10; Promissory Note, ECF No. 108-1, ¶6.) Furthermore, a servicer's 'refusal to accept a partial payment (which it is authorized to do) cannot alone render the amount in default 'false.'" *Glaser v. Nationstar Mortg.*, 2017 WL 1861850, *9 (N.D. Cal. May 9, 2017). (ECF No. 123, BANA Reply at 9.). Bybee's loan was also eligible for an FHA non-HAMP modification because it was not a co-signed loan and otherwise met all the necessary criteria defined in Mortgagee Letters 2009-23 and 2000-05.

Under Mortgagee Letter 2009-23, "FHA-HAMP can be utilized only if the mortgagor(s) does not qualify for current loss mitigation home retention options (priority order FHA Special Forbearance, Loan Modification and Partial Claim) under existing guidelines (ML 2008-21, 2003-19, 2002-17, 2000-05)." (ECF No. 108-9 at 2-3.) In this case, BANA found that Bybee was eligible for a Loan Modification under the existing guidelines provided by Mortgagee Letter 2000-05 (non-HAMP), thereby disqualifying Bybee for a HAMP loan modification under ML 2009-23.

The monthly payment offered in the July 2010 non-HAMP loan modification was reasonable and affordable to Bybee (ECF No. 120-2, Dep. L.Bybee, 107:2-4; ECF No. 109-15, Dep. T.Bybee, 97:18-98:1), the reduction in the interest rate was beneficial, and the three-year term extension allowed for a reasonable extension of time to pay the arrearages that had accumulated through Bybee's substantial default on the loan.

However, in the weeks leading up to BANA's offer on July 15, 2010, Bybee thought the residence's water cistern was failing, and he didn't want to put any money into the property. (ECF No. 127-5, Dep. L. Bybee, 12:13-22.). Bybee moved out on July 7, 2010, because he had been hauling water for three days, there was no water running in the house on that day, and he was exhausted. (ECF No. 109-15, Dep. T. Bybee, 11:2-25.) When BANA's offer of a loan modification came a week later, he was already living in his new rental house. Although he claims that his wife made a call to BANA (*see* ECF No. 109-15, Dep. T. Bybee, 7-15), according to BANA he moved off the property without any notification to BANA (ECF No. 124, Decl. J. Chatman, ¶5). (Under HUD regulations, when a

borrower in default abandons a property, the lender may initiate foreclosure without delay.  24 C.F.R. § 203.606(b)(1).)

Bybee had personal reasons for rejecting BANA's offer of a loan modification, and the Court cannot find any inadequacy in the loan modification or any irregularity or unfairness in the terms of the offer.  In addition, no foreclosure sale was then pending, so the allegation of 'dual tracking' is not supported by the evidence.  Bybee's wife testified that they discussed the matter with friends and decided that the offer was unacceptable, particularly because it capitalized the delinquent interest payments.  (ECF No. 120-3 at 98:4-7.) However, HUD Mortgage Letter 2000-05 specifically provides that "[a]ll or a portion of the PITI arrearage (principal, interest, and escrow items) may be capitalized to the mortgage balance."  (ECF No. 108-10 at 21.)  Any suggestion by Plaintiff or Plaintiff's experts that the interest should not have been capitalized is incorrect.  The Court finds that the July 2010  loan modification was a perfectly legal and reasonable offer that would have cured Bybee's delinquency and reinstated his original status on the loan.  Thus, the Court concludes that BANA's

July 2010 loan modification offer was not in any manner negligently designed or communicated.

*Montana Consumer Protection Act ("MCPA")*

The Montana Consumer Protection Act ("MCPA"), provides that

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

Section 30-14-103, M.C.A. The MCPA also provides that an individual action may be brought by a "consumer who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful by § 340-14-103...." Section 30-14-133(a), M.C.A. The Court notes that it has already ruled that MCPA allegations pertaining to conduct prior to June 28, 2011, are barred by the two-year statute of limitations. (ECF No. 38 at 20.)

Bybee claims that Rushmore violated the MCPA in 2013 when it did not offer him a loan modification. Rushmore counters with Montana law, which

provides that "a bank has no duty to modify or renegotiate a defaulted loan." *Morrow v. Bank of America, N.A.*, 375 Mont. 38, 47 (2014) (*citing Bank of Circle, N.A. v. Ralph Meyers & Son, Inc.*, 236 Mont. 236, 244 (1989)). No doubt the fact that BANA, the previous loan servicer, had already offered a loan modification that Bybee rejected entered into Rushmore's decision not to offer Bybee a loan modification option. Without a duty to offer a loan modification, Rushmore did not behave unfairly or deceptively, and thus there was no violation of the MCPA.

Bybee has also asserted an MCPA violation because Rushmore rejected several checks in late 2014 through June 2015. *See supra* at 12, fn.1. The Court is surprised that Bybee would make this claim because, first, this was a minor matter involving no deception, unfairness, or *actual harm* shown but a mere accounting error, second, the matter was formally resolved by stipulation of the parties (ECF No. 15), and, third, this Court approved of their stipulation (ECF No. 16). These were court-ordered payments that were being collected by Rushmore under the supervision of this Court, and if any of Bybee's payments were rejected improperly by Rushmore, Bybee's immediate and obvious recourse was to seek

this Court's assistance. That was not done. Instead, the parties agreed that the best way to circumvent Rushmore's internal accounting procedures was to redirect the payments to counsel's trust account. Both parties sought and received this Court's approval for that modification. (ECF No. 33.) Now Bybee attempts to reframe this incident as an MCPA violation deserving of trial to determine whether there was any malicious intent underlying the accounting error. The Court finds that this claim is without merit and, in fact, that it borders closely on frivolous.

Bybee has also claimed MCPA violations against Statebridge because (1) Statebridge sent Bybee a September 14, 2015, "welcome letter" to Bybee (ECF No. 99-1), (2) Statebridge sent Bybee an October 12, 2015, mortgage statement (ECF No. 99-2), and (3) Statebridge sent inspectors to the property on a monthly basis pursuant to the Deed of Trust. As more fully discussed below with regard to the Federal Debt Collection Practices Act, all of these actions were permissible steps required of an entity seeking to enforce a security interest. (It is worth remembering that this action began with Bybee's petition to *restrain* a nonjudicial

foreclosure sale, and each loan servicer (BANA, Rushmore, and Statebridge) has taken actions consistent with preparing for a nonjudicial foreclosure.)  In addition, Bybee has shown no ascertainable loss of money or property as a consequence of the alleged MCPA violations.  This claim is without merit.

*Short Sale Application*

Similarly, BANA's denial of Bybee's short sale application on May 21, 2011, was reasonable under the circumstances because Bybee failed to obtain a short sale offer that met the prerequisites of the HUD guidelines.  Plaintiff's theory that BANA missed a brief window during which an acceptable short sale offer was in hand is too tortured a reading of these facts.  It is clear that Homestead, Inc., communicated to BANA that it was unhappy with the $162,000 appraisal for the home, that there were many deficiencies in the property that should have lowered its value, and that Homestead, Inc., as Bybee's agent, wanted a second appraisal prepared.  BANA agreed to preparation of a second appraisal, and that fact alone put the Homestead, Inc., short sale offer on hold.  In addition, Homestead, Inc.

then dropped its offer from $138,118 to $114,200.  Unsurprisingly, BANA would not attempt to accept Homestead's original offer when Homestead clearly signaled that it considered the first appraisal to be defective and then requested a second appraisal.  Indeed, at approximately the same time that Homestead requested a second appraisal, Homestead also reduced its short sale offer by almost $25,000.  As Homestead acknowledges, it never submitted a short sale offer that met HUD regulations, meaning that BANA never had a short sale offer presented to it that met HUD regulations.  (ECF No. 127-4, Dep. L.Schicktanz, 193:12-16.)

Plaintiff argues that BANA could have and should have accepted Homestead's initial bid of $138,118.00 on January 15, 2011, when the minimum acceptable offer would have been $136,080.00.  The reason this did not happen, however, is that Homestead and Bybee stopped the momentum of the short sale process by challenging the accuracy of the first appraisal and demanding a second appraisal.  When they did so, the short sale process was momentarily paused to await the outcome of the second appraisal.  Had Bybee and its agent Homestead left the short sale process to run its course, the result would likely have been

different.  However, it is clear that Homestead was having indeed having second

thoughts about its original bid of $138,118.0, because on January 23, 2011, it

entered into a new purchase and sale agreement with Bybee that reduced its bid to

$114,200.  In other words, by January, 2011, Homestead's original offer was no

longer on the table, and BANA neither could have nor should have attempted to

completed the short sale process.

It is disingenuous of Bybee to claim now that BANA failed by not accepting

Homestead's original short sale offer, when BANA was simply responding to the

requests of Bybee and his agent, Homestead. During the third and fourth months

of the short sale process, the minimum bid required by HUD regulations would

have been $149,520 (84% of $178,000, the fair market value calculated by the

second appraisal requested by Homestead).  Thus, the short sale process failed

because Homestead and Bybee could not obtain an adequate short sale price under

the HUD regulations, not because BANA misunderstood or misapplied the HUD

guidelines.  Furthermore, any claim that BANA's denial of Bybee's short sale

application on May 21, 2011, violated the MCPA is barred by the two-year statute

of limitations.

Later, in August, 2011, Homestead and Bybee attempted to re-initiate the short sale process, hoping to obtain a variance from HUD, and BANA responded by detailing the documentation that Bybee/Homestead should submit in support of a request for a variance from HUD. (ECF No. 108-27, BANA 8/23/11 email to Schicktanz.) Apparently that documentation was not received, and BANA declined to pursue a short sale shortly thereafter. (ECF No. 108-28.)

*Deed in Lieu of Foreclosure*

BANA then offered Bybee a deed-in-lieu of foreclosure option, which Bybee declined because he believed it would be just as damaging to his credit as a foreclosure.

Again, the Court finds nothing in these events in the latter half of 2011 that demonstrate negligence or violation of the MCPA by BANA. Rather, it appears that BANA methodically worked through all the workout options available until there were no workout options available, other than foreclosure. In 2012, when

BANA began to record notices of successive foreclosure sales, Bybee consulted legal advisors and moved his family back into the home without notification to BANA. (ECF No. 109-14, Dep. L. Bybee, 234:6-14.)

Other than the bald, conclusory statements of Plaintiff's experts (amounting to mere scintillae of evidence unsupported by citation to law or regulation), Bybee has presented no evidence to the Court of negligence or any unfairness or deceptive conduct by BANA. The Court considered but did not rely on experts in this decision. In particular, the Court found the personal opinions of Plaintiff's experts to be unhelpful and irrelevant because Plaintiff's experts failed to grasp the applicable law and assumed facts not in evidence. It is unlikely that Plaintiff could have satisfied the tests for admissibility under Rule 702, Fed.R.Evid., and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), were his experts to be presented at trial. With or without his experts, Bybee has failed to meet his burden to show specific facts demonstrating a genuine need for trial.

*Trespass to Property*

Bybee claims that both Rushmore and Statebridge trespassed onto his property when they sent inspectors to their property. In support of this claim, Bybee expresses something like a metaphysical doubt that he was not in default on his loan. However, this Court has found that Bybee was in default on his loan and that there is no evidence to the contrary. The Deed of Trust allows inspections of the property in the event of default. (*See* Deed of Trust, ECF No. 102-1, ¶5.) After the deed was breached, Bybee lacked exclusive possession of the property, which is a prerequisite for a trespass claim. *See Prather v. Bank of America, N.A.*, 2017 WL 1929474 (slip copy) (D. Mont. May 9, 2017). By executing the contract, Bybee consented to the inspections. Therefore there was no trespass to property. There was also no invasion of Bybee's privacy where the inspectors only viewed the public areas of the property and Bybee was not even present, and Bybee does not contest this claim in his brief. In view of the fact that Rushmore and Statebridge paid the taxes and insurance on the property and Bybee had at least once abandoned the property in the past, it was reasonable for these loan servicers

to conduct monthly inspections to protect the value of the property, and, in any event, both loan servicers were contractually entitled to do so.

*Violation of Federal Debt Collection Practices ("FDCPA") Act*

Against Statebridge, Bybee's current loan servicer, Bybee asserts a claimed violation of the FDCPA. Bybee does not claim a violation of 15 U.S.C. 1692f(6), which prohibits attempts to take or threaten to take nonjudicial action to effect dispossession of a property if there is no present right to possession of the property claimed as collateral through an enforceable security interest. Instead, Bybee claims a violation of section 1692c(a)(2), which prohibits a debt collector's communications with a consumer represented by an attorney. Bybee also claims a violation of section 1692d, which prohibits harassment or abuse in connection with the collection of a debt. Bybee claims that is was a violation of the FDCPA when Statebridge sent him a "welcome letter" introducing itself in September 2015 (ECF No. 99-1), when Statebridge sent him a mortgage statement in October 2015 (ECF No. 99-2), and when Statebridge sent inspectors to the property on a

monthly basis, one of whom allegedly told Bybee's wife that they had a right to demand occupancy.

However, under Montana nonjudicial foreclosure law, the object of a nonjudicial foreclosure is to take possession of the security, not to collect a money debt from a consumer. *See Ho v. ReCon Trust Co., N.A.*, 858 F.3d 568, 573 (9th Cir. 2016) (as amended May 22, 2017) ("If ReconTrust can administer a trustee's sale without collecting a debt, it must be able to maintain that status when it takes the statutorily required steps to conduct the trustee's sale."). As under California law, in Montana, a nonjudicial foreclosure pursuant to a deed of trust does not result in a collection of money from the borrower but, rather, results in the dispossession of the borrower's property. Mont. Code Ann. § 71-1-317 ("Deficiency judgment not allowed.").

Generally, a mortgage loan servicer enforcing a security interest is not a debt collector under the FDCPA because the FDCPA addresses debtor collectors of money debts. On the other hand, "[i]f entities that enforce security interests engage in activities that constitute debt collection, they are debt collectors. We

hold only that the enforcement of security interests is not always debt collection."

*ReConTrust Co.*, 858 F.3d at 573.  In the context of a foreclosure case, most

provisions of the FDCPA simply do not apply to security interest enforcers.

*Dowers v. Nationstar Mortgage, LLC*, 852 F.3d 964 (9th Cir. 2017);  *Ho v.*

*ReconTrust Co.*, 840 F.3d 618 (9th Cir. 2016).  The narrow provision of the

FDCPA that specifically pertains to the nonjudicial foreclosure of property is

section 1692f(6), which provides that it is a violation of the FDCPA to foreclose

or attempt to foreclose on a property *only if* "there is no present right to possession

of the property claimed as collateral through an enforceable security interest."  15

U.S.C. 1692f(6).  Therefore, the FDCPA makes it a violation of the Act to attempt

to foreclose on a property without an enforceable security interest.  Bybee claims

not to be in default on his loan; however, this Court finds that Bybee is in default

on his loan.

　　　Statebridge cannot be in violation of the FDCPA for introducing itself to

Bybee as required by section 2605(c) of the Real Estate Settlement Procedures Act

("RESPA"), 12 U.S.C. § 2605, *et seq.*  Neither was it a violation of the FDCPA

when Statebridge sent Bybee a mortgage statement.  Bybee has a right to be reinstated if he pays the amount due, and he therefore has a right to be informed of the amount due, and the right continues even after forfeiture proceedings are begun.  (ECF No. 102-1, Deed of Trust, ¶ 10.)  There is nothing unfair, deceptive, or violative of the FDCPA in Statebridge's monthly inspections of the property, which inspections are one aspect of enforcing and protecting the security interest. "Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default."  (ECF No. 102-1, Deed of Trust, ¶ 5.)

The Court distinguishes *De Dios v. Int'l Realty & RC Invs.*, 641 F.3d 1071 (9th Cir. 2011) (holding that FDCPA does not apply to residential property manager collecting rents due prospectively), because *De Dios* interprets the general definition of "debt collector" in section 1692a(6)(F)(iii).  That statute is not in issue in this case, wherein the more specific statute, section 1692f(6) applies.  In the fuller context of this case, wherein the mortgage loan servicer, Statebridge, received a loan account that was already in default and had been delinquent for *seven* years, wherein the mortgagor had already sued the two

previous loan servicers to prevent nonjudicial foreclosure, there can be no doubt that Statebridge's general and ultimate objective was to enforce a security interest (*i.e.,* to foreclose), not to collect a money debt, and all of its actions were necessary steps leading to the accomplishment of that objective. For example, Statebridge may have been required by the Deed of Trust to give Bybee an opportunity to bring the loan current by notifying Bybee of the existence of the debt, the current balance due, and the risk of foreclosure, but that step was also necessary so that Statebridge could subsequently proceed to notification of default and notification of sale (pending the outcome of this case).

Having reviewed Bybee's testimony and claims, the Court finds that Bybee cannot demonstrate that he was subjected to harassment or abuse within the meaning of the FDCPA.


CONCLUSION

Plaintiff presents only a scintilla of evidence through his experts, who baldly opine as to their legal conclusions without supporting authorities, such as

their unsupported conclusion that Bybee was not in default on his loan. After careful review of the record, the Court does not find that any regulatory guidelines were violated by BANA when it attempted to find an acceptable alternative to foreclosure for Bybee's default on his loan.

There is no genuine dispute of the fact that Bybee was in default on his loan. There is no genuine dispute that BANA was not liable for the acts of TBW (acts which would have been barred by the statute of limitations had they been alleged against TBW itself, and would be likewise barred as against BANA). There is no genuine dispute that BANA was entitled to reject Bybee's one partial payment when Bybee was two years delinquent. There in no genuine dispute that BANA offered an appropriate loan modification that Bybee rejected. There is no genuine dispute that BANA did not "dual track" a foreclosure sale option with a loss mitigation option. There is no genuine dispute that BANA was entitled to terminate the short sale option after Bybee failed to produce an offer that met HUD guidelines. There is no genuine dispute that Bybee rejected BANA's offer of a deed-in-lieu of foreclosure. There is no genuine dispute that BANA was

obligated to proceed to foreclosure sale after all loss mitigation options were exhausted. There is no evidence of either a duty or a breach of a duty by BANA. There is no evidence of violation of the MCPA, and there is no evidence of loss of money or property as required by the MCPA. Thus, neither the applicable law nor the material facts support Bybee's claims against BANA.

As to Rushmore and Statebridge, Bybee has failed to show that either loan servicer acted deceptively or unfairly, invaded his privacy, trespassed onto his property, or harassed or abused him.

Having found that none of Bybee's substantive claims against the Defendants have merit, the Court concludes that all of Bybee's punitive damage claims must necessarily fail. *See Hovland v. Gardella*, 2008 WL 5395738, *14 (D. Mont. July 7, 2008). Accordingly,

IT IS HEREBY ORDERED that Defendants' motions for summary judgment are GRANTED, all other pending motions are DENIED, and the Fourth Amended Complaint is DISMISSED. All relief is denied to Plaintiff. The Clerk shall enter judgment for Defendants.

Dated this 28th day of September, 2017.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE